**JACOBS P.C.**
717 Fifth Avenue, 26th Floor
New York, New York 10022
(212) 229-0476
Robert M. Sasloff, Esq.

*Attorneys for KCT, Inc.*
*and 1060 Nepperhan Ave LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

| | |
|---|---|
| In re: | Case No.: 25-22056-SHL |
| **1060 NEPPERHAN AVE LLC** *et al.*,[1] | **Chapter 11** |
| Debtors. | **(Jointly Administered)** |

-------------------------------------------------------------------X
**1060 NEPPERHAN AVE LLC and KCT, INC.,**

| | |
|---|---|
| Plaintiffs, | Adv. P. No. 25-_____ |
| -against- | |

**PARKVIEW FINANCIAL REIT, LP, PARKVIEW**
**FINANCIAL 2020, LP, and ROCKWELL ONE**
**HOLDINGS, LLC,**

Defendants.
-------------------------------------------------------------------X

## ADVERSARY COMPLAINT

1060 Nepperhan Ave LLC ("**Borrower**") and KCT, Inc. ("**KCT**" and together with

Borrower, "**Plaintiffs**"), the above-captioned debtors and debtors-in-possession and Plaintiffs in

the above-captioned adversary proceeding, by and through their undersigned proposed attorneys,

Jacobs P.C., as and for the complaint herein against Defendants Parkview Financial REIT, LP

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: 1060 Nepperhan Ave LLC (3334); and KCT, Inc (6328).

#13822043v1\032485\0001

("**Parkview REIT**"), Parkview Financial 2020, LP ("**Parkview 2020**" and together with Parkview REIT, "**Lenders**" or "**Parkview**"), and Rockwell One Holdings, LLC ("**Rockwell**"), allege as follows:

## NATURE OF THE ACTION

1.      This is an action by Plaintiffs seeking damages and declaratory relief in connection with Parkview's deceptive lending practices, breaches of contract, and breaches of the covenant of good faith and fair dealing, as well as Rockwell's tortious interference, concerning a secured construction loan.

2.      In April 2022, Borrower obtained a project loan and a building loan from Lenders (collectively, "**Loan**") in the aggregate principal sum of up to $18,305,000 to finance the construction of Borrower's ground-up development ("**Project**") of an 8-story, 949-unit self-storage facility ("**Storage Facility**") at 1060 Nepperhan Avenue, Yonkers, New York ("**Property**").

3.      Under the subject Loan agreements, Lenders were obligated to periodically disburse the Loan proceeds at Borrower's request (a "**Disbursement Request**") to fund construction costs (labor, materials, etc.) incurred by Borrower to complete the Project. Borrower's ability to timely complete construction necessarily depended on the timely payment of its construction costs, which, in turn, depended on Lenders' timely disbursement of the Loan proceeds.

4.      Almost immediately, however, Lenders failed to timely fund Borrower's Disbursement Requests, causing significant and cascading construction delays that endangered the Project and substantially harmed Plaintiffs' interests.

5.      Of course, Lenders knew that Borrower's construction schedule relied on the

prompt disbursement of Loan proceeds to pay for that construction, which was the stated purpose of the Loan). Lenders also knew that substantial completion of the Project was necessary for Borrower to obtain traditional financing to pay off the Loan at maturity.

6.      Lenders nonetheless inexcusably delayed funding Borrowers' Disbursement Requests from the start of construction and each one thereafter, sometimes for several months. In turn, Borrower was unable to pay its construction contractors, subcontractors, suppliers and vendors (collectively, "**Contractors**"), which delayed several critical, interrelated phases of construction, including the foundation of the Storage Facility, the concrete superstructure (to be constructed on top of the foundation), the exterior of the Storage Facility (to be constructed and affixed to the concrete superstructure), and the installation of interior storage units.

7.      As a result of Lenders' failure to timely disburse the Loan proceeds, Borrower's (unpaid) Contractors temporarily ceased work, reduced Project staffing and resources, and refused to work certain days of the week (*i.e.*, weekends), all of which dramatically slowed construction and further delayed completion of the Project.

8.      It is apparent that Lenders, facing a capital shortfall, simply ran out of money to fund the Loan.

9.      Rather than disclosing their liquidity issues in good faith, Lenders not only tried to cover up their undercapitalization with stall tactics and excuses but sought to leverage their failure to fund the Loan to delay Borrower's construction, extract additional interest payments and fees, and force an avoidable maturity default in an attempt to take Borrower's equity in the Project through foreclosure.

10.     Stated simply, Lenders' failure to timely fund Borrower's Disbursement Requests resulted in significant, snowballing construction delays that prevented Borrower from completing

3

the Project by the anticipated completion date. Indeed, many millions of dollars of the amount

Lenders agreed to advance for construction remain undisbursed as of this pleading.

11.     Borrower has thus been deprived of the benefit of its bargain under the Loan – use

of the proceeds to fund and complete the Project – and, along with KCT, has suffered significant

harm as a result.   Consequently, Lenders are liable for money damages for their conduct, a

declaration that their security interests in the Project are unenforceable, or alternatively that any of

Lenders' security interests or right to repayment are equitably subordinated to the Project's other

creditors and equity owners.

## **PARTIES**

12.     1060 Nepperhan Ave LLC is a limited liability company organized under the laws

of the State of Delaware, with its principal place of business located at 1060 Nepperhan Avenue,

Yonkers, New York 10703.

13.     KCT, Inc. is a corporation organized under the laws of the State of New York, with

its principal place of business located at 1060 Nepperhan Avenue, Yonkers, New York 10703.

14.     On January 23, 2025 ("**Petition Date**"), Plaintiffs each filed voluntary petitions

("**Petitions**") for relief under chapter 11 of Title 11 of the United States Code ("**Bankruptcy

Code**"). On April 23, 2025, Plaintiffs filed a proposed joint plan of reorganization, which has not

yet been confirmed.

15.     Upon information and belief, Parkview Financial REIT, LP is a limited partnership

organized under the laws of the State of Delaware, with its principal place of business located at

11601 Wilshire Boulevard, Suite 2100, Los Angeles, California 90025.

16.     Upon information and belief, Parkview Financial 2020, LP is a limited partnership

organized under the laws of the State of Delaware, with its principal place of business located at

4

11601 Wilshire Boulevard, Suite 2100, Los Angeles, California 90025.

17.     Lenders, upon information and belief, transact business in the State of New York, including in connection with the subject Loan, and maintain an office located at 10 East 53rd Street, Suite 1401, New York, New York 10022.

18.     Upon information and belief, Rockwell One Holdings, LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 1323 SE 17th Street, Ste 327, Fort Lauderdale, Florida 33316.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this matter, pursuant to 28 U.S.C. §§ 157(a) and 1334(b), and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, entered February 1, 2012.

20.     This is an adversary proceeding, pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**").

21.     This action constitutes a core proceeding, pursuant to 28 U.S.C. § 157(b)(2), because the claims asserted herein arise under or in the above-captioned bankruptcy case ("**Bankruptcy Case**"), *In re 1060 Nepperhan Ave LLC et al.*, Case No. 25-22056-SHL, and concern the administration of the Bankruptcy Case. In the alternative, under 28 U.S.C. § 157(c)(1), this action is related to the Bankruptcy Case.

22.     Plaintiffs consent to the entry of a final order and judgment by this Court, pursuant to Rule 7008 of the Bankruptcy Rules.

23.     Venue in this Court is proper under 28 U.S.C. §§1408 and 1409(a) because this proceeding arises under or in, or is related to, the Bankruptcy Case, and is commenced in the district in which the Bankruptcy Case is pending.

#13822043v1\032485\0001

## FACTUAL ALLEGATIONS

**A.**    **Background**

24.    Borrower is the owner of the Property and the developer of the Project. KCT is Borrower's sole member and manager.

25.    On or about April 6, 2022, Borrower obtained the Loan from Lenders to finance construction in connection with the Project, which primarily consists of the planned Storage Facility to be constructed at the Property. Upon completion, the Storage Facility will be operated and branded by CubeSmart, one of the largest operators of self-storage facilities in the United States.

26.    The Loan is evidenced, governed, and secured by, among other documents, that certain: (a) (i) Project Loan Agreement ("**Project Loan Agreement**"); and (ii) Building Loan Agreement ("**Building Loan Agreement**" and together with the Project Loan Agreement, "**Loan Agreement**"), between Borrower, Lenders, and Parkview REIT, as Lenders' Administrative Agent ("**Agent**"); (b) (i) Project Loan Mortgage Note ("**Project Loan Note**"); and (ii) Building Loan Mortgage Note ("**Building Loan Note**" and together with the Project Loan Note, "**Note**"), made by Borrower to Lenders; (c) (i) Project Loan Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing ("**Project Loan Mortgage**"); and (ii) Building Loan Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing ("**Building Loan Mortgage**" and together with the Project Loan Mortgage, "**Mortgage**"), made by the City of Yonkers Industrial Development Agency ("**IDA**") and Borrower to Agent; and (d) Pledge and Security Agreement (LLC Interests) ("**Pledge Agreement**"), made by KCT to Agent.[2]

27.    Demolition of the pre-existing structure on the Property and related Project work

---

[2]    Each Loan document described in preceding points (a)-(d) (collectively, and together with all collateral documents, "**Loan Documents**") is dated as of April 6, 2022.

#13822043v1\032485\0001

began in or around March 2023. Borrower's construction of the Storage Facility began in or around July 2023. At present, the Project is approximately 53% complete due to significant construction delays attributable to Lenders' failure to timely fund Borrower's Disbursement Requests. Borrower required these funds to pay its Contractors and other construction costs necessary to complete the Project, as contemplated by the Loan Agreement.

28.     Following an alleged maturity default on the Loan in May 2024, Lenders refused to make any further Loan disbursements. Since then, construction has remained at a standstill while Borrower seeks alternative financing to complete the Project

29.     On or about December 2, 2024, Lenders initiated a non-judicial foreclosure action ("**UCC Sale**") against KCT to sell at public auction all membership and other equity interests in Borrower, which KCT had pledged as security for the Loan under the Pledge Agreement.

30.     Plaintiffs thereafter filed the Petitions seeking Chapter 11 relief under the Bankruptcy Code. As of the Petition Date, the outstanding principal balance of the Loan was $9,468,489.80, together with unpaid interest. The undisbursed amount of the Loan is $8,836,510.20.

31.     That notwithstanding, as alleged herein, Plaintiffs have actionable claims against Lenders due to, *inter alia*, Lenders' failure to timely fund the Loan, the proceeds of which should have been made available to Borrower for the purpose of completing the Project.

32.     In addition, in July 2024, Borrower engaged in negotiations with a third-party investor ("**John Doe Investor**") concerning a potential investment in the Property designed, in part, to ameliorate the problems caused by Lenders' failures to fund. In connection with the negotiations, John Doe Investor entered into a Confidentiality and Non-Circumvent Agreement ("**Non-Circumvent Agreement**") prohibiting John Doe Investor from circumventing Borrower,

including negotiating for or acquiring the Property or any loan, and from communicating with third parties concerning the Property, including lenders.

33.    Upon information and belief, John Doe Investor thereafter circumvented Borrower by engaging in prohibited discussions with Rockwell, a current Parkview investor with funds in the Project, concerning recent negotiations of a potential work-out agreement between Borrower and Lenders to restructure the Loan, which failed as a result of that interference.

34.    Rockwell and Lenders, upon information and belief, knew John Doe Investor was subject to the Non-Circumvent Agreement. Rockwell and John doe Investor knew that Lenders were subject to the Loan Agreement. Upon information and belief, John Doe Investor and Rockwell advised Parkview that Parkview should not make an agreement with Borrower but instead pursue the Property with John Doe Investor and Rockwell so that John doe Investor/Rockwell could acquire the Project via a UCC sale, a foreclosure or a transfer post UCC sale or foreclosure. Upon information and belief, Rockwell, Lenders, and John Doe Investor reached an agreement concerning the Project.

35.    In furtherance of this plan, Parkview provided Rockwell with a report it had commissioned from Partners Engineering detailing the Project's status of construction at the end of 2024. Frank Janos of Rockwell then contacted Noble Construction Group ("**Noble**") as a representative of the prospective owner of the Project and requested that Noble prepare its own estimate detailing the cost to complete the Project. In turn, Noble, at Rockwell's direction, contacted Borrower's Contractors, informed the Contractors that Noble was working for the new owner of the Project, and requested updates as to the status and cost to complete construction. This false information – that Rockwell was the new owner of the Project, sowed confusion and interfered with Borrower's contractors and relationship. This interference was made worse by dint

of the fact that it occurred during (and in apparent violation of) the automatic stay imposed by Borrower's bankruptcy filing.

36.     Upon information and belief, in so doing, John Doe Investor breached the Non-Circumvent Agreement and, along with Rockwell, tortiously interfered with Borrower's business and contractual relationships, and both Lenders and Rockwell aided and abetted the breach and otherwise knowingly participated in prohibited activity.

**B.     The Loan Disbursements**

37.     The stated purpose of the Loan was to finance direct construction and certain soft costs incurred by Borrower to complete the Project by the anticipated completion date ("**Completion Date**"), which was originally October 6, 2023 and later extended. (Loan Agreement, §§ 2.2).

38.     Under the Loan Agreement, the maturity date of the Loan ("**Maturity Date**") was October 1, 2023 ("**Initial Maturity Date**"). Upon satisfaction of certain conditions, Borrower had the option to extend the Maturity Date two times. (Building Loan Agreement, § 2.7).

39.     Consistent with the express purpose of the Loan, Lenders were contractually obligated to disburse the Loan proceeds at such times as Borrower requested (but not more than once every 14 business days) to fund Project construction, and were prohibited from unreasonably withholding Loan disbursements from Borrower. (Building Loan Agreement, §§ 3.2, 5.1(a), 5.3, 5.11).

40.     Pursuant to the Loan Agreement, a Disbursement Request submitted by Borrower would be accompanied by, *inter alia*, a line-item description of the construction work completed on the Project and the costs incurred by Borrower for each item of work performed. (Building Loan Agreement, §§ 5.3(a)(iii), 5.1(c)).

9

41.     Borrower was also required to pay Lenders an administrative fee of $5,000 with each Disbursement Request. (Building Loan Agreement, § 5.1(b); Project Loan Agreement, § 5.1(c)).

42.     After receipt of a Disbursement Request, Lenders were required to timely make the requested Loan disbursement for payment of the costs set forth in Borrower's Disbursement Request, *i.e.*, to pay Contractors and other construction costs.

43.     Lenders knew that Borrower's ability to timely pay its Contractors, and, in turn, its ability to substantially complete the Project by the Completion Date, hinged on Lenders promptly funding Borrower's Disbursement Requests, as required under the Loan Agreement.

44.     Indeed, Lenders fully understood that the Project was to be substantially completed within one and half years, which made it crucial for Lenders to timely fund each Disbursement Request so that construction could proceed on schedule.

45.     To this end, Lenders reassured Borrower on multiple occasions that Disbursement Requests would be funded promptly so that Loan proceeds were available to Borrower for payment of construction costs.

**C.     Lenders Fail to Timely Fund Borrower's Disbursement Requests**

46.     Lenders, however, failed to timely fund each of Borrower's Disbursement Requests from the time construction of the Storage Facility commenced in July 2023 through the alleged maturity default in May 2024, with Lender delaying and unreasonably withholding Loan disbursements for months.

47.     Unsurprisingly, Lenders' inordinate funding delays substantially prolonged Borrower's construction timeline and prevented Borrower from completing the Project by the Completion Date.

10

48.     Specifically, in July 2023, Lenders confirmed and reassured Borrower that its first Disbursement Request for construction of the Storage Facility's foundation (approx. cost of $1,600,000) would be funded by Lenders and that Loan proceeds would be available to pay Contractors to ensure construction continued to efficiently progress toward completion.

49.     Notwithstanding Lenders' representations, Lenders thereafter inordinately and unjustifiably delayed funding Borrower's Disbursement Request from the start of the foundation work, raising various excuses for their multi-month delay, among other stall tactics, in response to Borrower's repeated follow ups for a status of the funding Lenders confirmed months earlier would be disbursed to pay Contractors and continue advancing construction.

50.     Lenders also failed to timely fund each of Borrower's subsequent Disbursement Requests for other phases of construction, including the Storage Facility's concrete and steel superstructure, which similarly went unfunded for months without justification.

51.     In addition to failing to timely fund Borrower's Disbursement Requests, in each and every instance, Lender funded less than the amounts requested in Borrower's Disbursement Requests.

52.     Lenders' delay in funding Borrower's Disbursement Requests, which began almost immediately with the Storage Facility's foundation and continued through each subsequent phase of construction, rendered Borrower unable to timely pay its Contractors for work performed on the Project. This resulted in work stoppages and caused Contractors to reduce Project staffing, resources, and the number of days per week they would work, all of which significantly slowed the pace of construction thereby delaying completion of the Project.

53.     Borrower's inability to timely pay its Contractors between July 2023 and May 2024 was solely due to Lender's failure to timely fund Disbursement Requests properly submitted by

11

Borrower.

54.     Between July 2023 and May 2024, Borrower contacted Lenders repeatedly about their failure to timely fund its Disbursement Requests and requested status updates from Lenders with respect to the delayed Loan disbursements.

55.     Further, Lenders knew their failure to timely make requested Loan disbursements was causing construction delays and disruptions.

56.     In that regard, Borrower informed Lenders numerous times between July 2023 and May 2024 that, when Lenders failed to timely fund the Disbursement Requests, it would cause delays in Borrower's ability to timely pay its Contractors.

57.     Between July 2023 and May 2024, Borrower also informed Lenders on multiple occasions that their failure to timely fund its Disbursement Requests and the resulting delays in Borrower's ability to complete the Project by the Completion Date would prevent Borrower from obtaining traditional financing to pay off the Loan by the Maturity Date.

58.     Borrower also notified Lenders numerous times between July 2023 and May 2024 that its Contractors were frequently lodging complaints, and threatening to stop work and walk off the Project due to nonpayment caused by Lenders' persistent funding delays.

59.     Borrower was forced to constantly reassure its Contractors that Lenders would be funding prior Disbursement Requests and that delayed funds would become available in short order.

60.     In addition, the effect of Lenders' failure to timely fund each of Borrower's Disbursement Requests was compounded by the interrelatedness of each phase of construction, such that delay in completing one phase necessarily caused delay in commencing (and thus completing) another phase in the critical path of construction.

12

61.    For example, the delay in completing the Storage Facility's foundation caused by Lenders' multi-month failure to fund Borrower's corresponding Disbursement Request delayed construction of the concrete superstructure, which could not begin until construction of the foundation was completed. In turn, construction of the Storage Facility's exterior could not begin until construction of the concrete superstructure was completed.

62.    As such, Lenders' failure to timely fund each Disbursement Request had a snowball effect impacting other phases of construction, which only further delayed completion of the Project.

63.    Upon information and belief, Lenders delayed funding Borrower's Disbursement Requests, *inter alia*, because Lender lacked sufficient capital to do so.

64.    Delays in the Project caused by Lenders' failure to timely fund Borrower's Disbursement Requests have caused Borrower to incur significant additional costs, among other damages.

65.    Due to Lenders' failure to timely fund Borrower's Disbursement Requests, some of Borrower's Contractors temporarily refused to perform additional work on the Project. Borrower incurred substantial and unnecessary costs as result of temporary work stoppages, including in remobilizing Contractors to continue work on the Project.

66.    Moreover, certain Contractors who did not receive payment due to Lenders' funding delays have filed liens against the Property, which adversely impact Borrower's interests and Property rights, and has caused and will continue to cause Borrower to incur administrative expenses and legal fees.

67.    In addition, the Loan Agreement obligated Borrower to maintain costly insurance during the duration of the Project.  As a result, delays in the Project caused by Lenders' failure to

#13822043v1\032485\0001

timely fund Borrower's Disbursement Requests have caused Borrower to incur unnecessary insurance costs.

68.    Delays in the Project caused by Lenders' failure to timely fund Borrower's Disbursement Requests have also caused Borrower to incur significant fees to maintain construction permits.

**D.    Lenders Require Borrower to Sign Extension Letters
By Threatening to Further Delay the Project by Withholding Funds**

69.    Due to various Project delays attributable to Lenders' failure to timely fund Borrowers' Disbursement Requests, Borrower was unable to complete construction of the Project by the Completion Date.

70.    Upon information and belief, Lenders delayed funding Borrower's Disbursement Requests because of Lenders' illiquidity and lack of available capital to timely make the requested Loan Disbursements.

71.    Upon information and belief, Lenders intentionally delayed the Project in order to receive significant additional interest payments and fees under the Loan Agreement.

72.    Upon information and belief, Lenders frequently feigned excuses for their funding delays and disingenuously reassured Borrower that its Disbursement Requests would soon be funded to stall and cover up their intention to delay to Borrower's completion of the Project and their undercapitalization.

73.    Upon information and belief, Lenders intentionally delayed the Project to force Borrower to seek maturity date extensions, thereby allowing Lenders, *inter alia*, to impose certain conditions on Borrower under § 2.7 of the Loan Agreement, including requiring Borrower to pay fees and sign documents demanded by Lenders in connection with the extensions.

14

74.     Indeed, after months of delay, Lenders refused to fund Borrower's first Disbursement Request for construction of the Storage Facility's foundation unless Borrower signed an agreement, *inter alia*, to extend the Initial Maturity Date, pursuant to § 2.7 of the Loan Agreement.

75.     In other words, Lenders forced Borrower to seek an extension of the Initial Maturity Date in order to obtain substantially delayed Loan disbursements Borrower was already entitled to under the Loan Agreement and required to pay its Contractors to ensure construction continued toward completion.

76.     As such, pursuant to that certain Extension Letter, dated September 18, 2023 ("**First Extension Letter**"), Borrower and Lenders agreed to extend the Initial Maturity Date of the Loan to April 1, 2024 ("**First Extended Maturity Date**") in accordance with § 2.7 of the Loan Agreement. In the First Extension Letter, the anticipated completion date of the Project was April 6, 2024.

77.     It was only after the First Extension Letter that Lenders belatedly funded Borrower's Disbursement Request for construction of the foundation. This was the first time Lenders disbursed any Loan proceeds for the ongoing construction of the Storage Facility.

78.     As a condition to the First Extension Letter, Borrower was required to pay Lenders a $14,975 documentation fee and a $45,762 extension fee under § 2.7 of the Building Loan Agreement.

79.     Lenders' funding delays continued following the First Extension Letter, with Lenders failing to timely fund each of Borrower's subsequent Disbursement Requests as alleged above, including for construction of the Storage Facility's concrete superstructure. This again significantly slowed construction and deprived Borrower of the Loan proceeds required to pay

#13822043v1\032485\0001

Contractors and keep construction moving forward, resulting in further delays in completion of the Project.

80.      In March 2024, Lenders similarly refused to fund Borrower's outstanding Disbursement Request for construction of the Storage Facility's concrete superstructure unless Borrower sought an extension of the First Extended Maturity Date and signed another extension letter to that effect.  At the time, the requested funding was already delayed by approximately five (5) months.

81.      Accordingly, Borrower was forced to seek an extension of the First Extended Maturity Date to obtain substantially delayed Loan disbursements Borrower was already entitled to under the Loan Agreement and required to pay its Contractors to ensure the ongoing structural steel and concrete work on the upper floors of the Storage Facility superstructure would continue without further disruption or delay.

82.      As such, pursuant to that certain Extension Letter, dated March 25, 2024 ("**Second Extension Letter**" and together with the First Extension Letter, "**Extension Letters**"), Borrower and Lenders agreed to extend the First Extended Maturity Date to May 1, 2024 ("**Second Extended Maturity Date**") in accordance with § 2.7 of the Loan Agreement. In the Second Extension Letter, the anticipated completion date of the Project was May 6, 2024.

83.      It was only after the Second Extension Letter that Lenders finally (and belatedly) funded Borrower's outstanding Disbursement Request for construction of the Project superstructure.

84.      As a condition to the Second Extension Letter, Borrower was required to pay Lender a $14,975 documentation fee and $91,525 extension fee in accordance with § 2.7 of the Building Loan Agreement.

16

85.     Borrower was unable to complete construction of the Project by the extended Completion Date in the Second Extension Letter solely due to substantial Project delays caused solely by Lenders' persistent failure to timely fund Borrowers' Disbursement Requests since construction of the Storage Facility began.

**E.      Borrower is Forced to Seek Alternative Financing
After Lenders Terminate Funding of The Loan**

86.     Following ethe expiration of the Second Extended Maturity Date, on or about April 1, 2024, Lenders ceased all Loan disbursements and ultimately alleged a Loan maturity default by Borrower. While Lenders' funding delays and other improper conduct solely caused any delay in completing the Project or default under the Loan, Borrower nonetheless was forced to seek alternative financing to complete the Project.

87.     Because Lenders' failure to timely fund the Loan delayed construction and prevented Borrower from substantially completing the Project, Borrower was unable to obtain traditional financing with lower interest rates than is customary of construction financing.

88.     Because of Lenders' delayed funding and short funding, the Project construction was severely delayed.  The entire exterior of the building should have been completed before the maturity date and storage units installed on multiple floors.  That level of completion would have facilitated a refinance to a less costly loan, while retiring Borrower's debt to Lenders.  Instead, Lenders' funding delays have left Borrower with an open building that has one more floor to complete.

89.     Accordingly, Borrower's inability to turn to an alternate funding source means that Borrower may pay millions of dollars in additional fees and interest than it otherwise would have avoided had Lenders met their funding obligations – *i.e.*, Borrower has and is incurring more than $10,000,000.00 in damages (and potentially more if continuing delays persist) due to Lenders'

17

funding failures and breaches. Borrower also continues to incur significant legal fees in connection with Lenders' failure to fund the Loan and Borrower's resulting need for temporary funding from a third party to complete the Project.

## FIRST CAUSE OF ACTION
### (Breach of Contract – Against Lenders)

90.    Borrower repeats and realleges the allegations set forth in each of the preceding paragraphs of this Complaint as if fully set forth herein.

91.    The Loan Agreement is a valid and binding agreement between Lenders and Borrower.

92.    At all relevant times, Borrower complied with its obligations under the Loan Agreement.

93.    Under the Loan Agreement, Lenders were obligated make Loan disbursements at such times as Borrower requested to fund Project construction, and were prohibited from unreasonably withholding Loan disbursements from Borrower. (Building Loan Agreement, §§ 3.2, 5.1(a), 5.3, 5.11).

94.    Borrower submitted Disbursement Requests to Lender in the manner required by the Loan Agreement.

95.    Borrower materially satisfied any required conditions for Loan disbursements under the Loan Agreement.

96.    By unreasonably failing to timely fund each of Borrower's Disbursement Requests concerning construction of the Storage Facility, Lenders breached, *inter alia*, Articles III and V of the Loan Agreement, including §§ 3.2, 5.1(a), 5.3, and 5.11 of the Building Loan Agreement.

97.    Lenders' delay in funding Borrower's Disbursement Requests caused significant construction delays that prevented Borrower from completing the Project by the Completion Dates

in the Loan Agreement and Extension Letters, and prevented Borrower from repaying the outstanding balance of the Loan by the Second Extended Maturity Date.

98.     Any delays in completion of the Project were solely due to Lenders' breach of the Loan Agreement by failing to timely fund Borrower's Disbursement Requests.

99.     Due to Lenders' delay in funding Borrower's Disbursement Requests, Borrower was forced to delay payment to its Contractors in connection with construction of the Project.

100.     Borrower's inability to timely pay its Contractors between July 2023 and May 2024 was solely caused by Lenders' failure to timely fund Disbursement Requests submitted by Borrower.

101.     Due to Lenders' delay in funding Borrower's Disbursement Requests, Borrower's Contractors refused to perform any further work on the Project until they were paid in full.

102.     Borrower repeatedly informed Lenders, *inter alia*, that Lenders' failure to timely fund Borrower's Disbursement Requests was causing constructions delays and interruptions preventing Borrower from timely completing the Project and obtaining financing to pay the Loan at maturity. Borrower also informed Lenders that Borrower's Contractors constantly raised concerns about past due, late, and untimely payments for construction work performed on the Project.

103.     As a result of Lenders' breach of the Loan Agreement by failing to timely fund Borrower's Disbursement Requests, Borrower incurred, and continues to incur, interest on the Loan, including Default Interest, pursuant to the Note and the Loan Agreement.

104.     As a result of Lenders' breach of the Loan Agreement by failing to timely fund Borrower's Disbursement Requests, Borrower was forced to enter into the Extension Letters.

105.     As a result of Lenders' breach of the Loan Agreement by failing to timely fund

#13822043v1\032485\0001

Borrower's Disbursement Requests, Borrower was deprived of its bargained-for Loan proceeds under the Loan Agreement and was forced to pay substantial fees to Lenders, including, among others (a) two documentation fees, each in the amount of $14,975, and two extension fees, one in the amount of $45,762 and the other in the amount of $91,525, in connection with the Extension Letters; (b) a $5,000 administrative fee under the Loan Agreement for the multiple Disbursement Request submitted to Lender; and (c) in connection with the closing of the Loan and initial disbursement of Loan Proceeds under the Loan Agreement, a (i) a $366,100 origination fee; (ii) $51,250 in legal expenses; (iii) a $30,000 drawing review fee; (iv) a $10,000 in-house valuation fee; (v) a $4,500 appraisal fee; (vi) a $2,500 insurance review fee; and (viii) a $1,495 environmental review fee.

106.    As a result of Lenders' breach of the Loan Agreement by failing to timely fund Borrower's Disbursement Requests, which delayed completion of the Project, Borrower was forced to unnecessarily maintain costly Project insurance and permits.

107.    As a direct and proximate result of Lenders' acts and omissions alleged herein, Borrower has suffered and will continue to suffer damages in amount to be determined at trial, but believed to exceed $10,000,000, including, without limitation, (a) the difference in the interest, fees, and costs that Borrower has incurred and will continue to incur in connection with securing alternative funding from a third party due to Lenders' failure to perform and fund the Loan; (b) all fees and costs paid to Lenders from July 2023, *i.e.*, when Lenders funding delays and failure to perform under the Loan Agreement began; (c) any lost profits that Borrower incurred due to Lenders' breach of the Loan Agreement and delay of the Project; (d) additional costs of maintaining Project insurance and permits while the Project was delayed due to Lenders' breach of the Loan Agreement; and (e) costs incurred as a result of work stoppages and liens filed against

#13822043v1\032485\0001

the Property by Contractors due to nonpayment.

## SECOND CAUSE OF ACTION
### (Breach of the Covenant of Good Faith
### and Fair Dealing – Against Lenders)

108.    Borrower repeats and realleges the allegations set forth in each of the preceding paragraphs of this Complaint as if fully set forth herein.

109.    The Loan Agreement is a valid and binding agreement between Lenders and Borrower.

110.    The Loan Agreement imposes upon Lenders an implied duty of good faith and fair dealing in its performance and enforcement.

111.    At all relevant times, Borrower complied with its obligations under the Loan Agreement, including, without limitation, any conditions or requirements for receiving Loan disbursements.

112.    Lenders' actions require Lenders to exercise discretion in performing their obligations under the Loan Agreement, including without limitation, timely approving and funding Borrower's Disbursement Requests, and performing all other obligations under the Loan Agreement.

113.    Lenders breached the covenant of good faith and fair dealing in connection with the Loan by, *inter alia*, (a) continuing to charge Borrower fees and interest despite failing to perform under the Loan Agreement by intentionally delaying funding of Borrower's Disbursement Requests on feigned grounds and where Lenders lacked sufficient capital to make the disbursements due to undercapitalization; (b) intentionally delaying funding of Borrower's Disbursement Requests to delay the Project;  (c) imposing conditions, like the Extension Letters, on making Loan disbursements that had already been delayed for months and that Lenders lacked

21

sufficient capital to make; and (d) intentionally delaying funding of Borrower's Disbursement Requests to delay the Project and manufacture a maturity default, and then terminating all funding of the Loan on that purported basis.

114.    Lenders' foregoing acts and omissions were intended to and did deprive Borrower of its right and ability to receive the benefits of the Loan Agreement, including its bargained-for funding.

115.    As a direct and proximate result of Lender's acts and omissions alleged herein, Borrower has suffered and will continue to suffer damages in amount to be determined at trial, but believed to exceed $10,000,000, including, without limitation, (a) the difference in the interest, fees, and costs that Borrower has incurred and will continue to incur in connection with securing alternative funding from a third party due to Lenders' failure to perform and fund the Loan; (b) all fees and costs paid to Lenders from July 2023, *i.e.*, when Lenders funding delays and failure to perform under the Loan Agreement began; (c) any lost profits that Borrower incurred due to Lenders' breach of the Loan Agreement and delay of the Project; (d) additional costs of maintaining Project insurance and permits while the Project was delayed due to Lenders' breach of the Loan Agreement; and (e) costs incurred as a result of work stoppages and liens filed against the Property by Contractors due to nonpayment.

116.    In addition, Borrower seeks punitive damages for Lenders' breach of good faith and fair dealing. Lender engaged in unconscionable commercial practices, deception, misrepresentation, and the knowing concealment, suppression, and/or omission of material facts in connection with the Loan and its obligations thereunder, including Lenders continuing to charge Borrower fees and interest despite failing to perform under the Loan Agreement by intentionally delaying funding of Borrower's Disbursement Requests and improperly conditioning Loan

22

disbursements on Borrower entering into Extension Letters when Lenders lacked sufficient capital to make the Loan disbursements due to undercapitalization.

### THIRD CAUSE OF ACTION
#### (Declaratory Judgment – Against Lenders)

117.    Plaintiffs repeat and reallege the allegations set forth in each of the preceding paragraphs of this Complaint as if fully set forth herein.

118.    At all relevant times, Borrower complied with its obligations under the Loan Agreement, including, without limitation, any conditions or requirements for receiving Loan disbursements.

119.    Due to various Project delays solely attributable to Lenders' failure to timely fund Borrowers' Disbursement Requests, Borrower was unable to complete construction of the Project by the Completion Date.

120.    Upon information and belief, Lenders intentionally delayed funding Borrower's Disbursement Requests and intentionally delayed the Project to (a) force Borrower to seek maturity date extensions, allowing Lenders, *inter alia*, to impose certain conditions on Borrower under § 2.7 of the Loan Agreement, including requiring Borrower to pay fees and sign any documents required by Lenders in connection with the extensions; (b) in order to receive significant additional interest payments and fees under the Loan Agreement; (c) because of Lenders' illiquidity and lack of available capital to timely make the requested Loan Disbursements; and (d) to manufacture a maturity default in an attempt to take Borrower's equity in the Project through foreclosure.

121.    Lenders failed to timely fund each of Borrower's Disbursement Requests from the time construction of the Storage Facility commenced in July 2023 through the alleged maturity default in May 2024, with Lender delaying and unreasonably withholding Loan disbursements for months.

#13822043v1\032485\0001

122.     In July 2023, Lenders confirmed and reassured Borrower that its first Disbursement Request for construction of the Storage Facility's foundation (approx. cost of $1,600,000) would be funded by Lenders and that Loan proceeds would be available to pay Contractors to ensure construction continued to efficiently progress toward completion of the Project.

123.     Notwithstanding Lenders' representations, Lenders thereafter inordinately and unjustifiably delayed funding Borrower's Disbursement Request for construction of the foundation, and even then at a significantly reduced amount disbursed.  Lenders raised various excuses for their multi-month delay, among other stall tactics, in response to Borrower's repeated follow ups for a status of the funding, despite the fact that Lenders had confirmed months earlier the total amount needed for construction and had approved the funding amount to be disbursed to pay Contractors and continue advancing the Project's construction.

124.     But more than that, after months of inexcusable delay, Lenders still refused to fund the Disbursement Request for the foundation unless Borrower signed the First Extension Letter. Only after the First Extension Letter did Lenders belatedly fund Borrower's first Disbursement Request for construction of the foundation. This was the first time Lenders disbursed any Loan proceeds for the ongoing construction of the Storage Facility.

125.     As a condition to the First Extension Letter, Borrower was required to pay Lenders a $14,975 documentation fee and a $45,762 extension fee under § 2.7 of the Building Loan Agreement.

126.     In other words, Lenders forced Borrower to seek an extension of the Initial Maturity Date and pay Lenders significant fees in order to obtain substantially delayed Loan disbursements Lenders confirmed months earlier would be disbursed, and that Borrower was already entitled to under the Loan Agreement and required to pay its Contractors to ensure construction continued

24

toward completion.

127.    Lenders also failed to timely fund each of Borrower's subsequent Disbursement Requests for other phases of construction, including the Storage Facility's concrete superstructure, which similarly went unfunded for months without justification.

128.    Lenders' delay in funding Borrower's Disbursement Requests, which began almost immediately with the Storage Facility's foundation and continued through each subsequent phase of construction, rendered Borrower unable to timely pay its Contractors for work performed on the Project.

129.    This resulted in work stoppages and caused Contractors to reduce Project staffing, resources, and the number of days per week they would work, all of which significantly slowed the pace of construction thereby delaying completion of the Project.

130.    Borrower's inability to timely pay its Contractors between July 2023 and May 2024 was solely due to Lender's failure to timely fund Disbursement Requests properly submitted by Borrower.

131.    In March 2024, Lenders similarly refused to fund Borrower's outstanding Disbursement Request for construction of the Storage Facility's concrete and steel superstructure unless Borrower sought an extension of the First Extended Maturity Date and signed the Second Extension Letter.  At the time, the requested funding was already delayed by approximately five (5) months.

132.    As a condition to the Second Extension Letter, Borrower was required to pay Lender a $14,975 documentation fee and $91,525 extension fee in accordance with § 2.7 of the Building Loan Agreement

133.    In other words, Borrower was forced to seek an extension of the First Extended

25

Maturity Date and pay Lenders significant fees to obtain substantially delayed Loan disbursements Borrower was already entitled to under the Loan Agreement and required to pay its Contractors to ensure the ongoing structural steel and concrete work on the upper floors of the Storage Facility superstructure would continue without further disruption or delay. It was only after the Second Extension Letter that Lenders belatedly funded Borrower's outstanding Disbursement Request for construction of the superstructure.

134.    Lenders' failure to fund the Loan deprived Borrower of its right and ability to receive the benefits of the Loan Agreement, including its bargained-for funding to complete the Project.

135.    Lenders' acts and omissions alleged herein, including its intentional failure to fund the Loan and delay the Project, solely caused any default by Plaintiffs under the Loan Documents.

136.    Lenders' acts and omissions alleged herein, including its intentional failure to fund the Loan and delay the Project, constitutes a default and breach by Lenders under the Loan Documents.

137.    Lenders' acts and omissions alleged herein were intended to induce and stimulate Borrower's breach and default under the Loan Documents.

138.    Lenders' acts and omissions alleged herein were taken in bad faith and constitute inequitable conduct on Lenders' part.

139.    Lenders accordingly are not entitled to the equitable remedy of foreclosure against either Borrower or KCT, whether under the Mortgage, the Pledge Agreement, or otherwise.

140.    As a consequence of the foregoing, Plaintiffs are entitled to a declaratory judgment that Lenders are not entitled to the remedy of foreclosure, whether judicial or non-judicial, with respect to Borrower's Property, KCT's membership and equity interests in Borrower, or any other

26

alleged security interest under the Loan Documents.

## FOURTH CAUSE OF ACTION
### (Equitable Subordination – Against Lenders)

141.    Plaintiffs repeat and reallege the allegations set forth in each of the preceding paragraphs of this Complaint as if fully set forth herein.

142.    11 U.S.C.A. § 510 (c) permits a court to: (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate.

143.    As set forth above, Lenders engaged in inequitable, unjust and unfair conduct (including its breach of the duty of good faith and fair dealing) with respect to the Project and the Loan, offending fairness and good conscience and resulting in harm to Plaintiffs, their creditors, and the bankruptcy estates.

144.    As set forth above, Lenders' conduct with respect to the Project and the Loan has and continues to harm creditors by, *inter alia*, obstructing the completion of the Project, withholding funds earmarked to pay contractors and suppliers to the Project, and depleting assets available for distribution. As a result, unsecured creditors are less likely to recover the full amounts they are due.

145.    As set forth above, Lenders' conduct with respect to the Project and the Loan has conferred an unfair advantage upon Lenders.

146.    As a consequence of the foregoing, Lenders' claims should be equitably subordinated to all other creditors and all equity interests of KCT and Borrower pursuant to 11 U.S.C.A. § 501(c). Equitable subordination of Lenders' claims is consistent with the provisions of the Bankruptcy Code.

27

147.     In the alternative, as a consequence of the foregoing, the Court should declare that any of Lenders' liens or security interests in the Project, or any real property, membership interests or other assets of KCT or Borrower, be transferred to the bankruptcy estate pursuant to 11 U.S.C.S. § 501(c)(2).

## FIFTH CAUSE OF ACTION
### (Tortious Interference – Against Rockwell)

148.     Plaintiffs repeat and reallege the allegations set forth in each of the preceding paragraphs of this Complaint as if fully set forth herein.

149.     In July 2024, Borrower engaged in negotiations with John Doe Investor concerning a potential investment in the Property designed, in part, to ameliorate the problems caused by Lenders' failures to fund. In connection with the negotiations, John Doe Investor entered into a the Non-Circumvent Agreement prohibiting John Doe Investor from circumventing Borrower, including negotiating for or acquiring the Property or any loan, and from communicating with third parties concerning the Property, including lenders.

150.     Upon information and belief, John Doe Investor thereafter circumvented Borrower by engaging in prohibited discussions with Rockwell, a current Parkview investor with funds in the Project, concerning recent negotiations of a potential work-out agreement between Borrower and Lenders to restructure the Loan.  Those negotiations failed as a result of John Doe Investor's actions, aided by Rockwell.

151.     Rockwell, upon information and belief, knew John Doe Investor was subject to the Non-Circumvent Agreement and that Lenders were subject to the Loan Agreement. Upon information and belief, John Doe Investor and Rockwell advised Parkview that Parkview should not make an agreement with Borrower, nor fund the Loan, but instead facilitate Rockwell's/John Doe Investor's efforts to acquire the Project via a UCC sale, a foreclosure or otherwise. Upon

#13822043v1\032485\0001

information and belief, Rockwell, Lenders, and John Doe Investor reached an agreement concerning the Project to further this plan.

152.     In furtherance of this plan, Parkview provided Rockwell with a report it had commissioned from Partners Engineering detailing the Project's status of construction at the end of 2024.   Frank Janos of Rockwell then contacted Noble Construction Group ("**Noble**") as a representative of the prospective owner of the Project and requested that Noble prepare its own estimate detailing the cost to complete the Project. In turn, Noble, at Rockwell's direction, contacted Borrower's Contractors, informed the Contractors that Noble was working for the new owner of the Project, and requested updates as to the status and cost to complete construction.   This false information – that Rockwell was the new owner of the Project - sowed confusion and interfered with Borrower's contractors and relationship.   This interference was made worse by dint of the fact that it occurred during (and in apparent violation of) the automatic stay imposed by Borrower's bankruptcy filing.

153.     Upon information and belief, Lenders consequently terminated negotiations of a potential work-out agreement to restructure the Loan.

154.     Upon information and belief, in so doing, Rockwell, tortiously interfered with Borrower's business and contractual relationships with Lenders and its Contractors.

155.     As a direct and proximate result of Rockwell's actions, Plaintiffs suffered damages in an amount to be determined at trial, exclusive of attorneys' fees, costs, and interest.

156.     Rockwell is liable to Plaintiffs for all damages incurred as a result of its wrongful tortious interference with Borrower's contractual and business relationships with Lenders and its Contractors.

157.     In the event that Rockwell, John Doe Investor or any third party acquires the Loan

#13822043v1\032485\0001

from Lenders, that new owner will be subject to the same claims and defenses that Borrower has

alleged against Lenders herein, along with any other claims and defenses available in law or in

equity.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs 1060 Nepperhan Ave LLC and KCT, Inc. demand judgment

against Defendants Parkview Financial REIT, LP, Parkview Financial 2020, LP, and Rockwell

One Holdings, LLC, as follows:

(a)  On the First Cause of Action, in favor of Plaintiff 1060 Nepperhan Ave LLC and against Parkview, in an amount to be proven at trial, but believed to exceed $10,000,000, plus interest;

(b)  On the Second Cause of Action, in favor of Plaintiff 1060 Nepperhan Ave LLC and against Parkview, in an amount to be proven at trial, but believed to exceed $10,000,000, plus interest;

(c)  On the Third Cause of Action, in favor of Plaintiffs and against Parkview, declaring that Parkview is not entitled to the remedy of either judicial or non-judicial foreclosure in connection with the Loan, plus interest;

(d)  On the Fourth Cause of Action, a judgment equitably subordinating Parkview's claims or transferring Parkview's liens to the bankruptcy estate.

(e)  On the Fifth Cause of Action, an award of money damages in favor of Plaintiffs and against Rockwell, in an amount to be proven at trial, plus interest

(f)  Awarding Plaintiffs costs and fees, including, but not limited to, reasonable attorneys' fees, to the extent appropriate; and

(g)  Granting Plaintiffs such other and further relief as the Court deems just and proper under the circumstances.

Dated: New York, New York
       June 9, 2025

JACOBS P.C.

By: _/s/_ _____

30

Robert M. Sasloff, Esq.
717 Fifth Avenue, 26th Floor
New York, New York 10022
(212) 229-0476
robert@jacobspc.com

*Attorneys for Plaintiffs*
*KCT, Inc. and 1060 Nepperhan Ave LLC*

MORRISON COHEN LLP

Christopher Milito
Alexander Yarm
909 Third Avenue
New York, NY 10022
(212) 735-8769
cmilito@morrisoncohen.com
ayarm@morrisoncohen.com

*Proposed Special Litigation Counsel*
*for Plaintiffs KCT, Inc. and 1060 Nepperhan Ave*
*LLC*

#13822043v1\032485\0001